# United States Court of Appeals
## For the First Circuit

No. 12-1022

RAFAEL ORTIZ-BONILLA; LUIS J. TORRES-BAUZÁ;
JUAN MARTÍN SANTA-TORRES; JULIO GUZMÁN-FREIRE;
CRISTÓBAL VEGA-ADORNO; JUAN JAVIER HERNÁNDEZ-LEBRÓN,

Plaintiffs, Appellants,

FERNANDO MARTÍNEZ-BUITRAGO,

Plaintiff,

v.

FEDERACIÓN DE AJEDREZ DE PUERTO RICO, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Torruella, Howard, and Thompson,
Circuit Judges.

Donato Rivera-de Jesús, for appellants.
Albéniz Couret-Fuentes, with whom Lee R. Sepulvado-Ramos,
Jorge A. Galiber-Sánchez, and Sepulvado & Maldonado, PSC were on
brief, for appellee.

August 21, 2013

**THOMPSON, Circuit Judge.** In this case, we are called upon to referee a dispute between a group of chess players and their opponent, the Puerto Rico Chess Federation. Having come to a stalemate over events leading up to and during a chess federation meeting, the chess players filed suit against the federation in Puerto Rico Superior Court, alleging violations of their rights protected by the United States and Puerto Rico constitutions and Puerto Rico law. The chess federation removed the case to federal court pursuant to 28 U.S.C. § 1441. The chess players filed a second case, similar to the first, again in Puerto Rico court, this time excluding and waiving any claims under federal law. The chess federation removed this case as well, the district court consolidated the two, and declared jurisdiction over the second case under the All Writs Act, 28 U.S.C. § 1651(a). The district court ultimately granted summary judgment in favor of the chess federation and dismissed the chess players' claims. They now appeal, first challenging the district court's exercise of jurisdiction over their claims and then the court's dismissal of several of their Puerto Rico law claims. After careful consideration we affirm in part and reverse in part.

### Background

Appellants Rafael Ortiz-Bonilla, Luis José Torres-Bauzá, Juan Martín Santa-Torres, Julio Guzmán-Freire, Cristóbal Vega-Adorno, and Juan Javier Hernández-Lebrón (collectively "the

Chessplayers"), are members of the Puerto Rico Chess Federation, appellee Federación de Ajedrez de Puerto Rico, Inc. ("FAPR"). FAPR is a private, not-for-profit corporation, organized under the laws of the Commonwealth of Puerto Rico, established for the promotion and dissemination of chess. As a member of the international chess federation, Fédération Internationale des Eches ("FIDE"), FAPR also participates in international chess competitions.

Every two years, FAPR elects a Board of Directors in charge of the administration of the affairs of the organization. The election of interest in this case was scheduled to take place at the ordinary meeting scheduled for January 2011. On November 7, 2010, one of the Chessplayers, Cristóbal Vega-Adorno, submitted his candidacy for FAPR President in the upcoming election. The next day, ten FAPR members submitted a petition calling for an extraordinary meeting on November 20, 2010, to amend FAPR's constitution and restructure its organization administratively and fiscally.

FAPR's then-administrator, Vance Berríos, sent a message to the group e-mail address "ajedrezpr@yahoo.com" (it is not entirely clear which members subscribed to this group e-mail address). Berríos's message contained a notification written by FAPR's then-President, Omar Añeses Bocanegra, summoning all active members to a special meeting to be held on November 20, for the purpose of amending the FAPR constitution. Añeses's message

-3-

contained the text of the proposed amendments and a section titled "The Right to Participate in Meetings" that featured excerpts from the FAPR constitution pertaining to membership, voting rights, and new members. Five members, including three of the Chessplayers, responded to Añeses twice, challenging the validity of the extraordinary meeting. Añeses did not respond to those messages.

When several members of FAPR, including some of the Chessplayers, arrived at the extraordinary meeting they were barred from participating. Añeses excluded those members claiming they were not active members in good standing and denied permission to other members wanting to renew their memberships on the spot in order to participate in the meeting. And so the meeting was held without those members, with a quorum of sixty-four active members (fifteen members appeared via proxy). The proposed amendments were approved and the FAPR constitution was amended.

## A. The First Case

Unwilling to proceed like pawns, a few weeks later, on December 10, 2010, the Chessplayers filed a Request for Injunction against FAPR in the Superior Court of Puerto Rico, seeking invalidation of the November 20 meeting and the newly adopted constitutional amendments. This request alleged FAPR violated rights guaranteed to its members under the Constitution of the United States, the Constitution of Puerto Rico, and the General

Corporations Law of Puerto Rico. FAPR's counterplay was to remove the case to the Federal District Court of Puerto Rico.

The Chessplayers moved to remand, arguing lack of federal jurisdiction and in the alternative, appropriate application of the doctrine of abstention. Characterizing their claims under the United States Constitution as passing references that merely presented an alternative theory for relief, the Chessplayers relied predominantly on issues of Puerto Rico law and described their claims as Commonwealth law issues that in no way depended on the resolution of any substantial federal issues. Alternatively, the Chessplayers asked the district court to abstain from adjudicating any substantial federal questions and instead remand to the Puerto Rico court to allow that court to adjudicate the case on the merits of the Puerto Rico law issues and make moot any federal questions.

The district court denied the Chessplayers' request for remand, ruling they had pled a claim under the United States Constitution, and also denied their request for abstention. The Chessplayers moved to partially vacate the district court's order denying remand, again arguing lack of subject matter jurisdiction; the district court denied this motion. Soon after that, the Chessplayers filed a motion to amend their first request for injunction, voluntarily dismissing the federal claims the district court found in their first case. But, the district court denied this motion as well.

## B. The Second Case

Knowing they could not win by resigning, the Chessplayers filed a second Request for Injunction against FAPR again in the Superior Court of Puerto Rico. This second request alleged the same facts as the first, but omitted all claims of violations of rights guaranteed by the United States Constitution. The Chessplayers' complaint explicitly waived any claims they might have had under the United States Constitution.

Like the first round, FAPR removed the second case to federal court arguing that it contained identical facts, claims, and parties as the first case, and so the district court had subject matter jurisdiction over the second case and supplemental jurisdiction over the related Puerto Rico law claims therein.[1] FAPR argued the Chessplayers filed this second case in an attempt to divest the district court of the jurisdiction it previously asserted over the first case.

## C. The Consolidated Cases

The next day, FAPR moved to consolidate the cases, and the district court granted its request. FAPR then filed an answer to the Chessplayers' second complaint asserting there was no viable cause of action against them because as a private association FAPR

---

[1] According to FAPR's translation of the second request, paragraph twenty-four alleged violations of "rights that are federal in origin (under the United States legal system)" in addition to rights protected by the Commonwealth of Puerto Rico.

was not a state actor and thus was entitled to the court's deference regarding its private determinations. The Chessplayers moved to vacate the consolidation but the district court denied their motion. In response, the Chessplayers moved to remand the second case, stressing all federal claims in the second case were removed and expressly waived,[2] so there was no federal subject matter jurisdiction warranting removal.

Although the second case had already been removed and consolidated with the first case, FAPR filed a petition with the court the following day to enter an order retaining removal jurisdiction over the second case under the All Writs Act, and/or, in the alternative, enjoining the Chessplayers from prosecuting the second case in state court under either the Anti-Injunction Act or the All Writs Act. The district court denied the Chessplayers' request for remand of the second case, and found moot FAPR's petition, explaining its reasoning in an electronic order:

> The Court shall not remand to state court consolidated case 11-1208. Said case presents identical facts and claims to the instant case, and was filed subsequent to this court sustaining the removability of the present case. Plaintiffs, hence, have attempted to thwart this court's removal jurisdiction by filing the second case.

---

[2] In their motion to remand, the Chessplayers also explained FAPR relied upon an erroneous English translation of the second request, "the claims of the co-plaintiffs in this case are protected by rights that are federal in origin." According to the Chessplayers, an accurate translation of paragraph twenty-four states their claims "could be protected by rights that are federal in origin." The Chessplayers argued this correct translation makes clear their second case pleads no federal claims.

> <u>Removal of 11-1208 is hence proper under the All-Writs</u>
> <u>Act in order for this court to sustain its jurisdiction.</u>
> (emphasis added).

The Chessplayers then filed a motion for leave to file an interlocutory appeal regarding the district court's denial of their request to remand the second case; the district court denied this motion.

Finding themselves in a closed position, the Chessplayers moved for voluntary dismissal of their United States and Puerto Rico constitutional claims for lack of case or controversy, as both parties initially agreed that there were insufficient allegations to establish state action for the purposes of federal jurisdiction. Ignoring the issue of state action for the moment, FAPR opposed dismissal of the federal claims, asserting the Chessplayers were simply trying to somehow divest the district court of jurisdiction or find a way to have the case returned to state court. The district court denied the Chessplayers' motion.

FAPR then moved for summary judgment dismissing the consolidated cases, arguing its conduct did not constitute state action and the Chessplayers' Puerto Rico law claims did not warrant judicial intervention into the affairs of FAPR as a private association, and they failed to establish the four criteria required for an award of preliminary injunction. The Chessplayers opposed, arguing for summary judgment in their favor on what they asserted was now a request for permanent injunction. The district

court considered FAPR's motion as it applied to the Chessplayers' request for a permanent injunction, ultimately granting summary judgment in favor of FAPR, and dismissed the Chessplayers' claims under the United States and Puerto Rico constitutions premised on state action by FAPR. As to the Chessplayers' Puerto Rico law claims, the district court determined that FAPR's actions did not warrant judicial intervention and dismissed the claims. The district court's order did not include any discussion of the requirements for permanent injunction beyond success on the merits. Checkmated, the Chessplayers now appeal the district court's grant of summary judgment, arguing both cases should have been remanded to the Puerto Rico court for lack of subject matter jurisdiction. As to the merits of their claims, they do not appeal the district court's dismissal of their claims under the United States and Puerto Rico constitutions, but assert their Commonwealth claims should have been decided, on the merits, in their favor. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## Discussion

We divide our analysis into two parts. In the first we discuss the issues concerning federal subject matter jurisdiction, and then address the district court's dismissal of the Chessplayers' Puerto Rico law claims.

## A. Federal Subject Matter Jurisdiction

The Chessplayers generally assert that both cases belonged in the Puerto Rico court and not federal district court. FAPR contends the district court properly denied remand of both cases. To resolve this issue, we must determine whether the district court had federal subject matter jurisdiction over the cases. We review questions of federal subject matter jurisdiction de novo, when the relevant facts are not in dispute, and the removing party bears the burden of persuasion for the existence of federal jurisdiction. Samaan v. St. Joseph Hosp., 670 F.3d 21, 27 (1st Cir. 2012); BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers of Am., 132 F.3d 824, 830-31 (1st Cir. 1997). We begin by setting forth some guiding principles.

When a civil action is originally filed in state court, removal to federal court is proper only if the action could have initially been brought in federal court. 28 U.S.C. § 1441(a). This is so because of the "important federalism concerns at play in considering removal jurisdiction." Rosselló-González v. Calderón-Serra, 398 F.3d 1, 11 (1st Cir. 2004); see also Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 7-8 (1983). For cases, like this one, where there is no diversity of citizenship between parties, removal jurisdiction turns on whether the case falls within "federal question" jurisdiction: "The district courts shall have original jurisdiction of all civil

-10-

actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  But there is "no mechanical test for determining when an action aris[es] under federal law."  R.I. Fishermen's Alliance, Inc., v. R.I. Dep't of Envtl. Mgmt., 585 F.3d 42, 47-48 (1st Cir. 2009) (citing Franchise Tax Bd., 463 U.S. at 8).  As the Supreme Court has noted, the phrase "arising under" has "resisted all attempts to frame a single, precise definition for determining which cases fall within, and which cases fall outside, the original jurisdiction of the district courts."  Franchise Tax Bd., 463 U.S. at 8.

The jurisdictional question is determined from what appears on the plaintiff's claim, without reference to any other pleadings.  Templeton Bd. of Sewer Comm'rs v. Am. Tissue Mills of Mass., Inc., 352 F.3d 33, 37 (1st Cir. 2003).  There are two types of actions that may come within federal question jurisdiction.  The first category "involves direct federal questions; that is, suits in which the plaintiff pleads a cause of action that has its roots in federal law (say, a claim premised on the United States Constitution or on a federal statute)."  R.I. Fishermen's Alliance, 585 F.3d at 48.  These cases, which constitute the "vast majority" of cases brought under the general federal question jurisdiction of the district courts, are those "in which federal law creates the cause of action."  Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 808 (1986).  Where a complaint "is so drawn as to seek

-11-

recovery directly under the Constitution or laws of the United States," the federal court must entertain the suit.  <u>Bell</u> v. <u>Hood</u>, 327 U.S. 678, 681 (1946); <u>see also</u> <u>Ortiz De Arroyo</u> v. <u>Barcelo</u>, 765 F.2d 275, 279 (1st Cir. 1985).

If a claim does not allege a federal cause of action, "we must inquire into whether some element of the [plaintiff's] claim depends on the resolution of a substantial, disputed question of federal law."  <u>Templeton</u>, 352 F.3d at 36.  These constitute the second (and more controversial) category of cases, those with an "embedded federal question," meaning suits in which the plaintiff pleads a state-law cause of action that necessarily turns on some construction of federal law.  <u>Id.</u> at 37 (citing <u>Merrell Dow Pharm. Inc.</u>, 478 U.S. at 808-09); <u>Almond</u> v. <u>Capital Props., Inc.</u>, 212 F.3d 20, 23 (1st Cir. 2000).  These are cases where the issue is governed by state law, but "a federal issue is decisive to the dispute and the federal ingredient . . . is sufficiently substantial to confer the arising under jurisdiction."  <u>One & Ken Valley Housing Grp.</u> v. <u>Me. State Hous. Auth.</u>, 716 F.3d 215, 224 (1st Cir. 2013) (alteration in original) (quoting <u>W. 14th St. Commercial Corp</u>. v. <u>5 W. 14th Owners Corp.</u>, 815 F.2d 188, 196 (2d Cir. 1987)) (internal quotation marks omitted).  In evaluating the constitutional claims, we do not pass on the merits of the case.  <u>See</u> <u>Ortiz De Arroyo</u>, 765 F.2d at 279.  "A federal court that exercises federal question jurisdiction over a single claim may

-12-

also assert supplemental jurisdiction over all state-law claims that arise from the same nucleus of operative facts." BIW Deceived, 132 F.3d at 833; see 28 U.S.C. § 1367(a). With these principles in mind, we turn our analysis to the removal of the Chessplayers' first case.

## 1. The First Case

The first request for injunction, the Chessplayers argue, should have been remanded back to the Puerto Rico court for lack of federal subject matter jurisdiction. According to the Chessplayers, the first case merely mentioned the United States Constitution and relied predominantly on Puerto Rico law claims that did not depend on the resolution of a federal question. They further assert any references made to the United States Constitution were only alternative legal theories for their Puerto Rico law claims. FAPR contends that on its face, the first case alleged violations of federal constitutional rights and there is nothing therein to suggest the Chessplayers intended to limit their claims to Puerto Rico law.[3]

FAPR effected removal of the first case pursuant to § 1441, so we begin by asking whether the federal district court would have had original jurisdiction over the first case, had it

_____

[3] On appeal, the Chessplayers do not reprise their argument below that the district court should have abstained from deciding the federal issues and instead confine their argument to lack of subject matter jurisdiction.

-13-

been filed in that court.  BIW Deceived, 132 F.3d at 830.  There is no basis for diversity jurisdiction in this case, so we look to whether the district court would have had subject matter jurisdiction over the first case as one "arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

The Chessplayers' complaint first asserted FAPR "receives public funds from the Government of the Commonwealth of Puerto Rico, currently amounting to $200 Thousand a year, for the public purpose of carrying out programs to quantitatively and qualitatively organize, further, and develop chess in Puerto Rico" and Puerto Rico public schools.  According to the Chessplayers, the actions of FAPR board members (attributable to the organization) amounted to state action "because of the funds that the Commonwealth of Puerto Rico contributes annually to the FAPR."  The complaint went on to allege:

> 23. In addition to the right of the plaintiff and the other members of FAPR to vote in the assembly that is the subject of this request, their right to attend and participate in the same was also violated; without considering whether or not they would be allowed to vote at the relevant time.  The above violated the right to freedom of speech and to freedom of association of the co-plaintiffs guaranteed by the Constitution of the Commonwealth of Puerto Rico and the Constitution of the United States of America. . . .

> 37. The series of arguments contained in this petition, and specially the elements just described, illegally injured the right to vote, and the rights of freedom of speech and of free association of the above-mentioned members of the FAPR.  These are rights that are

-14-

guaranteed by the Constitution of the Commonwealth of Puerto Rico and <u>the Constitution of the United States of America</u> . . . .

> 48. If the remedy granted herein is not granted, plaintiffs will suffer serious and irreparable harm as members of the FAPR, consisting of the fact that they will lose the right of direct vote and the exercise of their freedom of expression and of association in all of the matters to be considered in assemblies of the FAPR, including decisions with an impact on the use of public funds that the institution receives as a direct allotment from the PR Legislative Assembly; and particularly including the right to vote directly for the president and the other members of the Board of Directors of the FAPR every two years; and the right of freedom of expression and freedom of association guaranteed by the Constitution of the Commonwealth of PR and <u>the Constitution of the United States of America</u>. (emphasis added).

These paragraphs plainly allege state action violations of speech and association rights guaranteed by the Constitution of the United States, claims "premised on the United States Constitution." <u>R.I. Fishermen's Alliance</u>, 585 F.3d at 48. The Chessplayers "seek recovery directly under the Constitution" of the United States, and their federal question appears on the face of their request. <u>Bell</u>, 327 U.S. at 681. Accordingly, the federal courts must entertain the suit. See <u>id.</u>; see also <u>W. Side Belt R.R. Co.</u> v. <u>Pittsburgh Constr. Co.</u>, 219 U.S. 92, 99 (1911) (explaining an assertion of a right under the Constitution of the United States necessarily raises a federal question).

It is immaterial that a claimant in retrospect views her federal claims as surplus, or after removal, moves to strike the federal claims. See <u>Ching</u> v. <u>Mitre Corp.</u>, 921 F.2d 11, 13 (1st

-15-

Cir. 1990). The plaintiff is the "master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987). Here, the Chessplayers, as masters of their claim, could have avoided federal jurisdiction by relying exclusively on Puerto Rico law. See id. at 399. Thus, the Chessplayers' decision to allege a violation of their rights under the United States Constitution opened the door for FAPR to remove the case to federal court. See id.; see also Ching, 921 F.2d at 14.

The Chessplayers argue the first case did not pose a "substantial" federal question, and any mention of the United States Constitution was merely an alternative legal theory to their state law claims. These arguments are unavailing as the Chessplayers ignore the crucial fact that their first request posed a direct federal question. An investigation into whether a cause of action asserts a "substantial" federal question is relevant only for state-law causes of action containing embedded federal questions. Templeton, 352 F.3d at 36 (stating that if the complaint does not allege a federal cause of action, the inquiry is then into "whether some element of the claim depends on the resolution of a substantial, disputed question of federal law"). The Chessplayers' first request alleged violations of their rights guaranteed by the Constitution of the United States, which constituted a "direct federal question" as "a claim premised on the

-16-

United States Constitution," so we need not continue our analysis to the "substantial" question query.  R.I. Fishermen's Alliance, 585 F.3d at 48; see also Templeton, 352 F.3d at 36.

Next citing a handful of out-of-circuit cases and one Supreme Court case, the Chessplayers argue federal jurisdiction will not extend to cases where the federal question appears only in an alternative argument for relief.  But this standard is applied to cases that assert causes of action created by state law, not direct federal question cases.  Unlike the plaintiffs in the cases they cite, the Chessplayers asserted an explicit federal question, clear on the face of their first complaint, not a state-law cause of action containing an embedded federal question.[4]  While the Chessplayers urge us to apply these inquiries to their first case, we cannot; the "substantial" element and "alternative theory" analyses are inapplicable in the present case because the Chessplayers pled in part an explicit federal question under the United States Constitution.

---

[4] The cases cited by the Chessplayers explain that the "alternative legal theory" inquiry is applied in cases where state law creates the cause of action.  See Dixon v. Coburg Dairy, Inc., 369 F.3d 811 (4th Cir. 2004); Howery v. Allstate Ins. Co., 243 F.3d 912 (5th Cir. 2001); Rains v. Criterion Sys. Inc., 80 F.3d 339 (9th Cir. 1996); Mulcahey v. Columbia Organic Chems. Co., 29 F.3d 148 (4th Cir. 1994).  The Chessplayers also rely on Christianson v. Colt Indus. Operating Corp., 486 U.S. 800 (1988). However, the Supreme Court in Christianson reasoned that the complaint itself alleged no federal claim, so the inquiry centered on whether patent law was a necessary element of one of the well-pleaded state-law claims.  Id. at 809.

Accordingly, we conclude the district court had subject matter jurisdiction over the Chessplayers' first request for injunction, and thus could exercise supplemental jurisdiction over the Puerto Rico law claims arising from the "same nucleus of operative facts."  See BIW Deceived, 132 F.3d at 833.

## 2. The Second Case

As we explained, the district court denied the Chessplayers' motion to remand the second case and deemed removal of it from the Puerto Rico court proper under the All Writs Act, 28 U.S.C. § 1651(a).  The Chessplayers challenge the district court's subject matter jurisdiction over the second filed action, arguing that there was no original jurisdiction under § 1441 and that removal of the second case pursuant to the All Writs Act was improper.  Although FAPR sought relief in the district court under both the All Writs and Anti-Injunction Acts, on appeal it plays around the issue of whether removal was proper under the All Writs Act.  Instead it makes an argument based on an interpretation of the Anti-Injunction Act that other federal jurisdictions have adopted.  FAPR contends the Chessplayers made an illegal move by filing the second case, in an attempt to thwart the district court's jurisdiction over the same claims presented in first case. FAPR reasons the district court properly prevented the Chessplayers from continuing in Puerto Rico court, thereby protecting its jurisdiction over the first case, as authorized by the Anti-

-18-

Injunction Act.  And so we examine whether the district court had jurisdiction over the second case.  We start by considering the appropriateness of the All Writs Act as a vehicle for removal.

The All Writs Act provides that the "Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  It is a "residual source of authority to issue writs that are not otherwise covered by statute."  Clinton v. Goldsmith, 526 U.S. 529, 537 (1999) (quoting Carlisle v. United States, 517 U.S. 416, 429 (1996)) (internal quotation marks omitted).  "[W]here a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 32 (2002) (quoting Pa. Bureau of Corr. v. U.S. Marshals Serv., 474 U.S. 34, 43 (1985)).  The "right of removal is entirely a creature of statute," and the Supreme Court has made clear that a suit "'commenced in a state court must remain there until cause is shown for its transfer under some act of Congress.'"  Id. (quoting Great N. Ry. Co. v. Alexander, 246 U.S. 276, 280 (1918)).  The removal statute is the controlling authority for removal, and the All Writs Act cannot excuse "compl[iance] with the statutory requirements for removal."  Id. at 32-33.

-19-

Applying these standards to this case, it is clear the district court lacked jurisdiction over the second case under the All Writs Act. The district court's order denying the Chessplayers' motion to remand the second case states, "[s]aid case presents identical facts and claims to the [first] one, and was filed subsequent to this court sustaining the removability of the [first] case. Plaintiffs, hence, have attempted to thwart this court's removal jurisdiction by filing the second case." The order goes on to proclaim removal of the second case "proper under the All-Writs Act in order for this court to sustain its jurisdiction." The district court's order is concise, but it is clear the court deemed removal proper "under the All-Writs Act" and not any other statutory provision. The statutory requirements for removal may not be avoided by relying upon the All Writs Act and accordingly, the Act could not provide the district court with jurisdiction over the second case. See id. at 33.

We also find no basis for jurisdiction pursuant to the removal statute, 28 U.S.C. § 1441(b). As we have explained above, removal of a case from state court to federal district court under § 1441 is proper only if the district court has original subject matter jurisdiction over the case. And so, to remove the second case pursuant to § 1441, it must have posed, on its face, a direct federal question or a state-law cause of action that necessarily

turned on some construction of federal law.  See R.I. Fishermen's Alliance, 585 F.3d at 48; Templeton, 352 F.3d at 36.

Unlike the first complaint, the Chessplayers' second request did not assert claims "premised on the United States Constitution."  R.I. Fishermen's Alliance, 585 F.3d at 48.  No elements of their state law claims required "resolution of a substantial, disputed question of federal law."  Templeton, 352 F.3d at 36.  They expressly waived any federal claims in their second request.  As such, the district court was mistaken in its assertion that the second case made identical claims to the first. And therefore no basis for federal subject matter jurisdiction existed, and the original jurisdiction required for removal pursuant to § 1441 was absent.[5]  Consequently, we find the district court erroneously concluded it had jurisdiction over the second case and so we remand it to the district court with instructions to

---

[5] Because the district court incorrectly deemed the All Writs Act a proper vehicle for removal of the second case it never ruled on the merits of FAPR's alternative argument that the court was nonetheless correct in preventing the second case from proceeding in the Commonwealth court pursuant to an exception to the Anti-Injunction Act.  Given the particular circumstances of this case, we need not decide--and we express no view on--that argument now. Instead, we leave the issue to be litigated on remand if necessary.

remand to the Commonwealth court.[6]  We proceed to our review of the last claims.[7]

## B. Summary Judgment

To remind the reader, FAPR's motion for summary judgment addressed the Chessplayers' initial request for a preliminary injunction.  In their opposition to FAPR's motion, the Chessplayers clarified their position: they were now seeking a permanent, not a preliminary, injunction and they claimed entitlement to summary judgment on that request (the ultimate claim in their consolidated cases).

In ruling on FAPR's motion for summary judgment the district court found no state action and dismissed all of the Chessplayers' claims premised on such a theory under the United States and Puerto Rico constitutions.  The court also dismissed all

---

[6] We do not accept jurisdiction over cases that belong in state court, as 28 U.S.C. § 1447(c) requires us to remand them back to state court if, before final judgment, it appears we incorrectly assumed jurisdiction. See Franchise Tax Bd., 463 U.S. at 8.

[7] The Chessplayers also argue that even if the district court did have jurisdiction over the first case and not the second, the exercise of jurisdiction was vitiated by the consolidation of the cases, which prevented them from effectively pursuing their second case in Puerto Rico state court, where they had already obtained a preliminary injunction hearing.  This argument was not raised below and is therefore waived. Martex Farms, S.E. v. U.S. Envtl. Prot. Agency, 559 F.3d 29, 33 (1st Cir. 2009).  We further note the Chessplayers do not reprise their argument below, seeking abstention by the federal court, so we also consider this issue waived. Beatty v. Michael Bus. Mach. Corp., 172 F.3d 117, 120 n.2 (1st Cir. 1999).

claims based on Puerto Rico law.  Citing <u>Finn</u> v. <u>Beverly Country Club</u>, 683 N.E.2d 1191, 1193 (Ill. App. Ct. 1997),[8] the district court noted that the conduct of a voluntary association is subject to judicial review only when it fails to exercise powers consistent with its own rules.  It then concluded that after reviewing the submitted documents, the constitution and bylaws of FAPR, none of the actions taken by FAPR were done in an arbitrary or capricious manner, and thus judicial intervention was not warranted.

On appeal, the Chessplayers do not challenge the district court's dismissal of their constitutional claims premised on state action.  They focus only on their Commonwealth claims, arguing that FAPR's actions preceding and during the extraordinary meeting violated the FAPR constitution and the General Corporations Law of Puerto Rico.  They reprise their argument to the district court that FAPR's actions were clearly arbitrary and capricious and inconsistent with its own internal rules.

---

[8] The district court explained that because FAPR cited Illinois case law in its summary-judgment motion and the Chessplayers also referenced this same law in their response, it would likewise apply this principle of judicial noninterference in making its determinations.  Puerto Rico and other legal authorities recognize the same standard.  <u>See</u> <u>Universidad del Turabo</u> v. <u>L.A.I.</u>, 126 D.P.R. 497 (P.R. 1990); 6 Am. Jur. 2d Associations and Clubs § 27.  Louisiana (the only other state that operates, like Puerto Rico, under a civil code) also uses this standard.  <u>See</u> <u>English</u> v. <u>Nat'l Collegiate Athletic Ass'n</u>, 439 So. 2d 1218, 1221-22 (La. Ct. App. 1983).

## 1. Standard of Review

We review the district court's grant of summary judgment de novo. Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013). And we view the record in the light most favorable to the Chessplayers, as the unsuccessful party, drawing all reasonable inferences in their favor. See Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013). Summary judgment is appropriate when there is "no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013); Fed. R. Civ. P. 56(a). That the matter was resolved on cross motions does not change our standard of review. Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 61 (1st Cir. 2000). "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004) (quoting Wightman v. Springfield Terminal Ry., 100 F.3d 228, 230 (1st Cir. 1996)) (internal quotation marks omitted). We are not bound by the reasoning of the district court, but rather, "may affirm the entry of summary judgment on any ground made manifest by the record." Harrington v. Aggregate Indus.-Ne. Region, Inc., 668 F.3d 25, 30 (1st Cir. 2012) (citing Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999)).

The issuance of a permanent injunction would be appropriate only if the district court made four findings: "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief" (i.e., an injury for which there is no adequate remedy at law); "(3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." Asociación de Educación Privada de P.R., Inc. v. García-Padilla, 490 F.3d 1, 8 (1st Cir. 2007).

## 2. Relevant Law

Many jurisdictions, including Puerto Rico and Illinois, consider the constitution and bylaws of a not-for-profit organization to constitute a contract between the organization and its members. Diamond v. United Food & Commercial Workers Union Local 881, 768 N.E.2d 865, 870 (Ill. App. Ct. 2002); Universidad del Turabo, 126 D.P.R. 497. These are a unique type of contract in which the member, either expressly or implicitly, "agrees to abide by all rules and regulations adopted by the organization." Diamond, 768 N.E.2d at 869 (quoting Blackshire v. Nat'l Ass'n for the Advancement of Colored People (NAACP), Inc., 673 N.E.2d 1059, 1061 (Ill. App. Ct. 1996)) (internal quotation marks omitted); Lee v. Snyder, 673 N.E.2d 1136, 1139 (Ill. App. Ct. 1996) (quoting Engel v. Walsh, 101 N.E. 222, 223-24 (Ill. 1913)); Universidad del

-25-

_Turabo_, 126 D.P.R. 497. The constitution or bylaws may provide procedures to resolve issues that arise within the organization and might also expressly endow authority in an officer or director to interpret the constitution or bylaws. See, e.g., _Finn_, 683 N.E.2d at 1193-94; _Edwards_ v. _Ind. State Teachers Ass'n_, 749 N.E.2d 1220, 1225 (Ind. Ct. App. 2001). Where this sort of authority is granted, the members, through their contractual relationship with the organization, agree that the authorized officer has the power to interpret and the members may be bound by those interpretations; accordingly, the court gives deference to the authorized officer's interpretations. _Diamond_, 768 N.E.2d at 870; see _Finn_, 683 N.E.2d at 1194.

That is not to say there is no place for judicial intervention. The organization's bylaws and constitution are a contract, and thus by virtue, can be breached. _Diamond_, 768 N.E.2d at 870. And "if the organization provides no avenue for internal review or appeal, then judicial intervention in an internal dispute may be appropriate." 6 Am. Jur. 2d Associations and Clubs § 27; see also _Engel_, 101 N.E. at 224. "[C]ourts generally will not interfere with the internal affairs of a voluntary association absent mistake, fraud, collusion or arbitrariness." _Poris_ v. _Lake Holiday Prop. Owners Ass'n_, 983 N.E.2d 993, 1001 (Ill. 2013); _Finn_, 683 N.E.2d at 1193. But, the conduct of voluntary associations will be subject to judicial review "when they fail to exercise

power consistently with their own internal rules or when their conduct violates the fundamental right of a member to a fair hearing." Finn, 683 N.E.2d at 1193; see also Diamond, 768 N.E.2d at 870; Hernández v. Asociación Hosp. del Maestro, Inc., 106 D.P.R. 72 (P.R. 1977).[9]

In our de novo review we must examine the record before us to determine whether the district court properly awarded summary judgment to FAPR on the Chessplayers' request for injunction. The heart of the Chessplayers' argument is that FAPR acted in an arbitrary and capricious manner, based on unauthorized or erroneous interpretations of the organization's constitution. They do not detail the four specific requirements for permanent injunction, but instead focus their argument as a challenge to the district court's determination on the merits (which is where the district court ended its analysis). The Chessplayers' appeal is limited to the district court's grant of summary judgment on the following issues: exclusion of certain members from the extraordinary meeting; proxy voting; freezing renewals and new memberships; and notification of the extraordinary meeting only though e-mail. We take each of the Chessplayers' assigned claims of error in turn.

---

[9] We note that while no one has presented this argument here, judicial intervention into the dealings of a private association is warranted when other due-process type violations have occurred. Finn, 683 N.E.2d at 1193; Hernández, 106 D.P.R. 72; Diamond, 768 N.E.2d at 870.

## a. Exclusion of Existing Members

The Chessplayers challenge FAPR's exclusion of certain members from participating in the extraordinary meeting on the grounds they were not "active" members. They specifically take issue with former president Añeses's definition for "active" membership, which he enforced prior to and at the extraordinary meeting. The definition of "active" imposed by Añeses allowed members who were "up to date with the payment of their membership fees" and "also participated in at least one chess tournament sponsored by the Federation during the immediately preceding twelve months" to participate in the November 20 meeting. Citing Article III of the FAPR constitution, the Chessplayers assert this definition of "active" member is contrary to the organization's rules and regulations. FAPR maintains the exclusion of certain members was based in sound reasoning.

We look to the FAPR constitutional provisions regarding member voting in extraordinary meetings. Article VI(2) of the FAPR constitution states that in meetings "whether ordinary or extraordinary, only active members whose annual dues are current may participate. The same day of the meeting - and before it begins - a member may bring his membership current." Article III requires FAPR members to "remain active attending the meetings, participating in the activities, and paying the assigned dues."

There are no additional definitions for "active" in the FAPR constitution.

The constitution states the "Board of Directors will govern with the best criteria and will be the supreme body, with the exception of the assembly." It goes on to grant the President powers to "act as the Federation's official representative and will make whatever decisions he/she needs to take when the Board of Directors or the Assembly is not meeting." But FAPR's constitution contains no provision granting the President or any other Board Member the power to interpret the terms of the constitution. Accordingly, there is no authorized officer whose interpretations require our deference. See Diamond, 768 N.E.2d at 870.

The definition of "active" employed by Añeses draws from the FIDE (the International Chess Federation) handbook, specifically the section pertaining to the criteria for ranking the top FIDE chess players. Six times each year, the Qualification Commission of FIDE prepares a list of the top active players; a player will not be included on the list if he or she is inactive. The handbook describes inactivity as when a player has played "no rated games in a one year period." Añeses's definition of "active" combined the FIDE handbook's description of inactivity for

inclusion in the top players list with Article III of the FAPR constitution.[10]

But the FAPR constitution does not require the adoption of terms in the FIDE handbook pertaining to ratings, nor does it state that terms as described by FIDE must or may be employed by FAPR.  FIDE is mentioned only twice in the FAPR constitution: Article II(b) states FAPR will "divulge the game of chess" as regulated by the FIDE, and Article IV(a) states FAPR "must be affiliated with the F.I.D.E."  There is no specific provision in the FAPR constitution for the implementation of FIDE terminology or definitions.  Rather, Article III defines "the members" of FAPR without any reference to the FIDE.  Thus, Añeses's incorporation of the FIDE description of "inactivity," taken from the criteria for inclusion in the top rated players list, to the FAPR constitutional provisions for member participation in meetings was not grounded in any FAPR constitutional provision.  Nor was his interpretive action authorized by any power enunciated in the constitution, so we owe it no deference.  See Diamond, 768 N.E.2d at 870.  As such, FAPR "fail[ed] to exercise power consistently with its own internal rules," and so its "conduct is subject to judicial review."  Finn, 683 N.E.2d at 1193.

---

[10] Añeses's message, sent to the group e-mail address, justified this definition of active, stating the FIDE provisions complement the rules and regulations of FAPR, and FIDE considered active members those who participated in activities (which he clarified as "tournaments, etc.") in the previous twelve months.

Applying de novo review, we conclude the Chessplayers successfully demonstrated this action was arbitrary and warranted judicial intervention.

### b. Proxy Voting

The minutes from the extraordinary meeting clearly state that fifteen of the sixty-three member quorum voted by proxy. The Chessplayers assert the inclusion of votes by proxy was not authorized by any FAPR provision and was inconsistent with the Rules of Parliamentary Procedure adopted in Article VI of its constitution. FAPR contends inclusion of votes by proxy was permissible.

We turn to Article VI of the FAPR constitution--"About the Meetings"--which states that meetings "whether ordinary or extraordinary . . . will be guided by Roberts Rules of Order." Robert's Rules state, "[p]roxy voting is not permitted in ordinary deliberative assemblies unless the laws of the state in which the society is incorporated require it, or the charter or by-laws of the organization provide for it." RONR (11th ed.), p. 428-29.

It is clear that the November 20 meeting was not an ordinary meeting, rather it was an extraordinary meeting. And Robert's Rules regarding proxy voting pertain specifically to "ordinary deliberative assemblies" and are silent as to extraordinary meetings or deliberative assemblies. As the November 20 meeting was not an ordinary meeting, the limitations on

proxy voting enunciated in Robert's Rules cannot be applied as though it were an ordinary deliberative assembly. While the FAPR constitution is silent on the specific issue of proxy voting, the inclusion of proxy votes at the extraordinary meeting does not appear to be inconsistent with the FAPR constitution, as it incorporates Robert's Rules of Order. The Chessplayers have not shown they prevail even on the merits of this claim, and we conclude the district court did not err in its grant of summary judgment on this issue.

### c. Freezing Renewals

The Chessplayers argue FAPR violated its constitution by prohibiting existing members from renewing their memberships up to or on the day of the extraordinary meeting, thereby preventing them from participating. FAPR plays around this argument, and admits the constitution provides for payment of dues on the day of an assembly. They contend Article VI(2)'s participation provision may be limited based on the previously discussed "active" membership requirement as defined by former president Añeses.

We turn again to Article VI(2) of the FAPR constitution, the provision pertaining to member voting: "The same day of the meeting - and before it begins - a member may bring his membership current." It is clear from the text of Article VI(2) that existing members who wished to bring their membership current on November 20 were entitled to do so. As we already determined, Añeses's

adoption of the FIDE definition of "active" to bar member participation in meetings was not supported by the FAPR constitution, and was an exercise of power inconsistent with the organization's internal rules. See Diamond, 768 N.E.2d at 870. We believe this claim has merit.

### d. Barring New Members

Next, the Chessplayers allege FAPR violated its own constitution by refusing to allow new members to join the organization. FAPR counters that admission as a member is not automatic, as provided in the constitution. The Chessplayers point to Articles V and VI(1) of the FAPR constitution to support their claim that new members could participate in the meeting if they joined no later than November 30. But the Chessplayers' citations are to provisions that pertain to meetings for Board of Directors elections, not extraordinary meetings, the type of meeting at issue in this case. FAPR correctly refers to Article III(b), which states any person with knowledge of chess or interest in learning may "apply for admission" and "acquire it by majority decision" of the Board. The November 20 extraordinary meeting was not for the election of Board of Directors; thus FAPR's refusal to allow new members to apply and participate in the extraordinary meeting was not inconsistent with its internal rules. See Diamond, 768 N.E.2d at 870; Finn, 683 N.E.2d at 1193. We find no arbitrary or capricious action.

### e. Notification by E-mail

The last issue for our review is the notification FAPR provided for the extraordinary meeting. The Chessplayers claim they never authorized FAPR to provide them notice via e-mail, and so notification of the extraordinary meeting sent only by e-mail violated Puerto Rico corporations law. We note that this is the only argument, on appeal, for which the Chessplayers invoke a specific provision of Puerto Rico law. So we apply the relevant provision from Puerto Rico law for the analysis of this issue. P.R. Laws Ann. tit. 14, § 3661 (2009) addresses notice by electronic transmission, and subsection (d) clarifies that this section applies to any corporation not authorized to issue capital stock (for which all references to stockholders are deemed to refer to members of the corporation). Section 3661(b)(2) states that notice shall be deemed given "by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice."

It is undisputed that FAPR's former administrator Berríos sent the notification for the extraordinary meeting only by e-mail, not to individual e-mail addresses, but rather to the group address "ajedrezpr@yahoo.com." FAPR stops short of arguing its members consented to receiving notice via e-mail and instead merely cites

prior instances of notification for meetings sent by e-mail.[11]  It argues only that e-mail correspondence was customary.  However, we find nothing in § 3661 to support the contention that prior receipt or customary practice constitutes consent.  Because FAPR did not have the consent of its members to issue e-mail only notification, we find the Chessplayers have carried their burden to show success on the merits, that this was indeed arbitrary and capricious action by FAPR.

As previously noted, because the district court concluded its analysis after finding no merit to any of the Chessplayers' claims, it became unnecessary for the court to discuss any of the three remaining permanent injunction elements.  Because we disagree in part with that conclusion, remand is necessary to allow the district court to determine if the Chessplayers have satisfied the remaining elements for the issuance of a permanent injunction. See McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 357, 369 (3d Cir. 2007) (where the district court erroneously "denied injunctive relief only on the basis that [plaintiff] did not demonstrate a likelihood of success on the merits, and [plaintiff] raises appellate arguments limited to that basis," deciding only the merits issue and remanding for a consideration of the remaining factors); Idaho Watersheds Project v. Hahn, 187 F.3d

---

[11] FAPR members were previously alerted to extraordinary meetings held in July 2010 and October 2010 by e-mails sent to this group address.

1035, 1037 (9th Cir. 1999) (where the district court erred in concluding that the appellants failed to establish a likelihood of success on the merits, remanding for the district court to consider the possibility of irreparable injury and whether the balance of hardships tips in favor of the appellants); Black & Decker, Inc. v. Hoover Serv. Ctr., 886 F.2d 1285, 1296 (Fed. Cir. 1989) (same); Tatro v. Texas, 625 F.2d 557, 558 n.1 (5th Cir. 1980) (same). In our review of the record before us, we note that the Chessplayers, in opposing FAPR's motion for summary judgment, did file a statement of facts citing to affidavits of individual Chessplayers which discuss how the arbitrary actions harmed their interest and which arguably address the remaining three factors for permanent injunction.[12] As to those claims we find meritorious the district court will have to determine if this record supports a finding that the Chessplayers suffered irreparable injury, whether the harm to them outweighs the harm to the defendants from the imposition of an injunction, and whether the public interest would not be adversely affected by the issuance of an injunction.

### Conclusion

To recap, we find the district court had federal subject matter jurisdiction over the first case. The district court did

---

[12] For example, one affidavit stated the amendments to the FAPR constitution "violated my most fundamental democratic rights" yet Berríos and Añeses "went ahead and re-structured the organization in such a way that it is practically impossible for an outsider like me to gain an elective position in a fair election."

-36-

not have subject matter jurisdiction over the second case, and we remand it to the district court with instructions to remand it to the Commonwealth court where it was originally filed. Utilizing our de novo review, we conclude the district court correctly granted summary judgment to FAPR in part. However, the Chessplayers showed success on the merits for three of their appealed claims, and we remand those claims to the district court for further consideration in accordance with this court's decision. Each party shall bear its own costs.